## In re NEW YORK, NEW HAVEN & HART-FORD R. CO.

### No. 107.

Circuit Court of Appeals, Second Circuit.

Jan. 2, 1945.

Motions for Modification and Stay of Mandate
Denied Jan. 23, 1945.

Choate, Hall & Stewart, of Boston, Mass. (John L. Hall and James Garfield, both of Boston, Mass., of counsel), for debtor-appellant.

Henry S. Drinker, Edwin A. Lucas, Drinker, Biddle & Reath, and John Dickinson, all of Philadelphia, Pa. for Pennsylvania R. Co.

William D. Morton, Jr., of Boston, Mass., for Protective Committees for Holders of Preferred and Common Stock of New York, New Haven & Hartford R. Co.

Appleton, Rice & Perrin, of New York City (Lee J. Perrin, and Clifton S. Thomson, both of New York City, of counsel), for Bank of Manhattan Co.

Harold E. Staples and Tillinghast, Collins & Tanner, all of Providence, R. I., for Rhode Island Hospital Nat. Bank of Providence.

Howard W. Brown, Peabody, Brown, Rowley & Storey, Willard B. Luther and Peabody, Arnold, Batchelder & Luther, all of Boston, Mass., for Merchants Nat. Bank of Boston.

Edgar Turlington, and Greenbaum, Wolff & Ernst, of New York City, Roberts & McInnis, of Washington, D. C., for appellants Protective Committee for Bonds of Housatonic R. Co.

Richard Ely, Ely, Bradford, Thompson & Brown, Joseph B. Ely, all of Boston, Mass. (Seibert & Riggs, of New York City, of counsel), for appellant Protective Committee for Bonds of Old Colony R. Co.

Robert T. Bushnell, Atty. Gen., Arthur E. Whittemore, Sp. Asst. Atty. Gen., Earl Johnson, of Boston, Mass., for Commonwealth of Massachusetts.

Henry E. Foley, of Boston, Massachusetts, for appellant City of Boston.

Henry W. Anderson, of Richmond, Va., and Curtiss K. Thompson, of New Haven,

Conn. (Hunton, Williams, Anderson, Gay & Moore, of Richmond, Va., and Parmelee & Thompson, of New Haven, Conn., of counsel), for Institutional Group for Boston Terminal Bonds.

Robert H. Davison, of Boston, Mass. (Haussermann, Davison & Shattuck, of counsel), for appellant Webster & Atlas Nat. Bank of Boston, Trustee.

Damon E. Hall and Rutherford E. Smith, both of Boston, Mass. (Hurlburt, Jones, Hall & Bickford, all of Boston, Mass., of counsel), for appellant Mutual Savings Bank Group Committee for Boston Terminal Co. Bonds.

Charles S. Clark, of South Duxbury, Mass., for Town of Duxbury.

Oliver & Donnally, of New York City (Fred N. Oliver and Willard P. Scott, both of New York City, of counsel), for Mutual Savings Bank Group.

Stewart & Shearer, of New York City (William A. W. Stewart and M'Cready Sykes, both of New York City, of counsel), for United States Trust Company of New York, Trustee of The Harlem River & Port Chester Mortgage.

Root, Clark, Buckner & Ballantine, of New York City (William P. Palmer and Philip E. Gregg, both of New York City, of counsel), for Bank of New York, Trustee under The New England Railroad Company Mortgage.

James L. Homire, of Washington, D. C., for Reconstruction Finance Corporation.

Beers & Beers, of New Haven, Conn. (Edmund Ruffin Beckwith, of New York City, of counsel), for Protective Committee for Holders of Boston and New York Air Line First Mortgage 4% Bonds.

Davis, Polk, Wardwell, Sunderland & Kiendl, of New York City (Edwin S. S. Sunderland, Judson C. McLester, Jr., Russel S. Coutant, and Arthur L. Krenzien, all of New York City, of counsel), for Insurance Group.

White & Case, of New York City (Fitzhugh McGrew, of New York City, of counsel), for Bankers Trust Company, Trustee, First and Refunding Mortgage.

Davies, Auerbach, Cornell & Hardy, of New York City (H. C. McCollom, of New York City, of counsel), Attorneys for Irving Trust Company, Trustee under 6% Collateral Trust Indenture.

Mitchell, Capron, Marsh, Angulo & Cooney, of New York City (Edward E. Watts,

Jr., of New York City, of counsel), for City Bank Farmers Trust Company, Trustee, First Mortgage Central New England Railway Company.

Charles A. Coolidge, Oscar M. Shaw, and Warren E. Carley, all of Boston, Mass. (Ropes, Gray, Best, Coolidge & Rugg, of Boston, Mass., of counsel), for Old Colony R. Co.

Hermon J. Wells, of New Haven, Conn. (J. H. Gardner, Jr., of New Haven, Conn., of counsel), for Trustees of property of New York, New Haven & Hartford R. Co.

Before SWAN, AUGUSTUS N. HAND and FRANK, Circuit Judges.

SWAN, Circuit Judge.

These fifteen appeals have been heard together upon a consolidated record. All of the appellants have appealed from an order of the district court entered March 6, 1944 approving a plan of reorganization for the New York, New Haven & Hartford Railroad Company (hereafter for brevity called "New Haven" or the "debtor") under section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. Three of the appellants, Bank of the Manhattan Company, Rhode Island Hospital National Bank of Providence, and Merchants National Bank of Boston, have appealed also from an order of the district court entered March 13, 1944 classifying creditors and stockholders. The appellants fall into several groups having common interests and raising the same or similar contentions. The issues presented will be discussed as distinct problems in so far as practicable and without necessarily referring to all of the appellants affected by them.

1. Objections to procedure: Numerous appellants complain of the procedure adopted by the district court and the Interstate Commerce Commission with respect to the fourth and fifth supplemental reports of the Commission. Its fourth supplemental report was filed with the court on July 13, 1943. After hearings upon objections to the plan approved by the Commission in its fourth supplemental report the district judge filed an opinion, 54 F.Supp. 595, expressing his approval of it in general but stating that in a few particulars the plan did not comply with legal standards, and indicating certain corrections that should be made. The opinion also invited the Commission, if it saw fit, to file a further supplemental report while the judge was hold-

ing the matter under advisement. Acting upon this suggestion the Commission, without further public hearings, filed its fifth supplemental report on February 8, 1944. The court ordered that all objections to the fourth supplemental report should be treated as objections to the fifth, permitted the filing of additional objections and, after hearing all objectors, rendered an opinion approving the plan, 54 F.Supp. 631, and made a formal order of approval.

Appellants urge that upon the certification of a plan by the Commission to the court, section 77, sub. e, 11 U.S.C.A. § 205, sub. e, requires the judge either to approve it or to dismiss the proceedings or to refer them back to the Commission for further action. We do not think that the statute compels a procedure so inelastic. Subdivision d of the section provides that after public hearings the Commission may either approve or refuse to approve any plan, and "may thereafter, upon petition for good cause shown filed within sixty days of the date of its order, and upon further hearings if the Commission shall deem necessary, in a supplemental report and order modify any plan which it has approved, stating the reasons for such modification." Under this provision we cannot doubt that until the court has acted upon the plan certified to it, the Commission has power, upon the timely petition of a party in interest or upon its own motion, to clarify, perfect or modify the plan on the basis of evidence already before it and without further hearings, if it deems such hearings unnecessary. Nor has the Commission doubted its power to render on its own motion a supplemental report modifying a plan previously certified to the court. Chicago Great Western Railroad Company Reorganization, 233 I. C. C. 63, 64; Chicago, Rock Island & Pacific Railway Company Reorganization, 249 I. C. C. 297. In the case at bar the court took under advisement the plan of the Commission's fourth supplemental report; it had entered no order of approval or disapproval before the fifth supplemental report was received. The fact that the court wrote an opinion inviting the filing of a fifth supplemental report and suggesting certain corrections in the plan of the fourth report certainly did not deprive the Commission of its statutory power under subdivision (d) to improve the plan by a supplementary report. We regard it as a commendable instance of "properly coordinated action" between the court

and the Commission, the importance of which was noted in Ecker v. Western Pacific R. Corp., 318 U.S. 448, 475, 63 S.Ct. 692, 708, 87 L.Ed. 892.

2. Capitalization and stockholders' equities: Four appellants, namely, the debtor, the Pennsylvania Railroad Company (which owns a large block of the debtor's common stock) and two committees for New Haven stockholders (one representing holders of preferred stock, the other holders of common) complain of approval of the plan because it excludes existing stockholders from any participation therein.

The plan first approved by the Commission in March 1940, on the basis of a record closed in June 1939, fixed the total capitalization of the reorganized debtor at $365,000,000 and found that existing preferred and common stock was worthless. In September 1940 the Commission reopened the record to take further evidence with respect to the reorganization of the Old Colony Railroad, and a supplemental report was made in February 1941, modifying the plan of reorganization but making no change in the total capitalization or in the finding of no value for New Haven stock. This plan the court disapproved in an opinion of December 8, 1941 (unreported) without passing on the new capitalization and the lack of value of existing stock. After further hearings the Commission issued its third and fourth supplemental reports, the latter dated July 13, 1943. The plan approved in the fourth supplemental report reaffirmed the finding of no value for the stockholders' equity and left unchanged the authorized capitalization of the reorganized company, although it decreased the amount of senior securities and increased the amount of common stock to be issued in order to reflect a reduction of about $25,000,000 in the debtor's secured obligations resulting from payments of back interest and matured principal made in December 1942 and April 1943 pursuant to authorization by the court. The Commission's fifth supplemental report filed on February 8, 1944 again made no change in the authorized capitalization or the finding of worthlessness of existing stock. The district judge approved the elimination of stock equities, 54 F.Supp. 631, at page 634 for reasons stated in his opinion discussing the plan approved by the Commission in its fourth supplemental report, 54 F.Supp. 595, at pages 600-603.

Recent opinions of the Supreme Court in the Western Pacific and Milwaukee cases, Ecker v. Western Pacific R. Corp., 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892, and Group of Institutional Investors v. Chicago, M., St. P. & P. R. Co., 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959, make plain that determination of the amount and character of the capitalization of a reorganized railroad and the making of valuations upon which the capitalization depends are functions of the Commission which may be reviewed by the court only to the limited extent of seeing that the Commission has observed legal standards. The district judge found no violations of legal standards; and we agree. It is true that the Commission did not marshal its facts and figures to show just how it reached a capitalization of $365,000,000; but it considered all relevant factors, and the Supreme Court has said that "* * * the lack of a valuation in dollars is immaterial." Western Pacific case, 318 U.S. 448, at page 483, 63 S.Ct. 692, at page 712, 87 L.Ed. 892; see also Milwaukee case, 318 U.S. 523, at page 539, 63 S.Ct. 727, at page 737, 87 L.Ed. 959. Hence there is no merit to the objection that no specific valuation was found for the debtor's rights giving it access to the Grand Central Terminal. As the third supplemental report states, those rights were considered in determining the amount of the new capitalization.

The main complaint of the equity interests is based on the contention that during the pendency of these proceedings there have occurred such reductions in the debtor's secured obligations by reason of payments on account of accrued interest or principal, such increases in its recent earnings,[1] and such improvement in the ratio of current assets to current liabilities that the Commission's finding that the existing stock has no value should not be sustained. Each of these factors was considered by the Commission in its fourth supplemental report (254 I. C. C. 405, 406 et seq.), and the conclusion was reached that they did not warrant an increase in the authorized

---

[1] The earnings record of the New Haven from 1939 through 1943 shows income available for fixed charges, as follows:

| | |
|---|---|
| 1939 | $10,541,889 |
| 1940 | $11,384,458 |
| 1941 | $19,422,633 |
| 1942 | $32,982,016 |
| 1943 | $35,820,122 |

capitalization or a finding of value for existing stock. These were matters for its expert judgment and its conclusions are supported by material evidence. As the Supreme Court recognized in the Milwaukee case, 318 U.S. at page 543, 63 S.Ct. at page 739, 87 L.Ed. 959, war-time earnings are not a reliable criterion for establising the financial structure which is to serve the reorganized railroad for an indefinite future. Having established the capitalization at $365,000,000, the fourth supplemental report demonstrates that the existing stock had no value on June 30, 1943 by estimating the secured claims as of that date at $274,040,694 and the unsecured claims, without interest, at $104,582,706. The district judge was therefore justified in affirming the Commission's finding that "at the time of the finding the equity of * · * * stockholders has no value," section 77, sub. e.

 It is true that the district court has power to determine whether changed circumstances require that the plan be referred back to the Commission for reconsideration. Milwaukee case, 318 U.S. at page 542, 63 S.Ct. at page 739, 87 L.Ed. 959. But the judge's opinion, 54 F.Supp. at page 603, found that the objecting stockholders had not carried the burden of showing that subsequent events make necessary a rejection of the Commission's plan. Nor are we convinced, despite the large current assets (including cash) which the debtor has built up, that earnings subsequent to June 30, 1943 have already or certainly will produce an increase in assets and a reduction in debt sufficient to create an equity value in the stock. It is for the informed judgment of the Commission rather than for the courts to determine the sufficiency of any cash reserve to meet the uncertainties ahead. Consequently we find no error in the district court's refusal either to recommit the plan to the Commission, or to delay reorganization until the probable extent and duration of war earnings can be more accurately determined, or to issue stock warrants to represent an equity which may develop in the future but does not presently exist. Similar contentions were rejected in the Western Pacific and Milwaukee cases, supra. See also Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 517, 64 S.Ct. 1129.

 Finally it is urged that the judge's opinion, 54 F.Supp. at page 603, shows that he formed no independent judgment as to the correctness of the Commission's finding that the equity of the stockholders has no value, and that such an abdication of the statutory duty imposed upon the judge by § 77, sub. e, constitutes in itself reversible error. Appellants rely upon the statement in the Western Pacific case, 318 U.S. at page 478, 63 S.Ct. at page 710, 87 L.Ed. 892, that "The specificity of the direction for reexamination of the Commission's action points to a wider scope of review than an inquiry as to whether statutory standards for valuation have been followed." But the paragraph in which this sentence appears, when read as a whole, fully justifies, in our opinion, the limited inquiry made by the judge in the case at bar where the excess of obligations over authorized new capitalization required merely a mathematical calculation.

For the foregoing reasons we affirm the order in so far as the stockholder interests are concerned but we do so without prejudice to the right of the Commission, if it sees fit, to reconsider the plan in the light of changes in the circumstances of the debtor in respect to increase of assets or reduction of debts which have occurred or may occur before the plan is finally approved by the district court.

3. Housatonic 5% bonds: A committee for holders of 5% fifty year consolidated gold bonds of Housatonic Railroad Company have appealed from approval of the provisions of the plan with respect to these bonds. The principal amount outstanding is $2,819,000; they matured November 1, 1937; interest has been paid by the New Haven trustees as it has accrued and presumably will continue to be paid until consummation of the reorganization. The plan gives them 100 per cent. face value of new first and refunding bonds bearing 4 per cent. interest and maturing in the year 2003. They ask to be paid in cash, and argue that the plan is not fair and equitable as to them in view of the treatment accorded other bond issues less well secured and the payment in cash of certain other secured debts.

 The first problem is whether the district court erred as a matter of law in basing its approval on the Commission's findings instead of making independent findings that the plan is fair and equitable, affords due recognition to each class of creditors, does not discriminate unfairly in favor of any class of creditors, and will conform to the requirements of the law of the land regarding the participation of the

various classes of creditors. In its third supplemental report, 254 I. C. C. 63, 75, the Commission found that "the new fixed-interest bonds have elements of value which compensate for any comparatively unfavorable features and that they will constitute a fair and equitable equivalent for the Housatonic bonds." Considering himself bound to accept the Commission's finding of equivalence between the new bonds and the old, if supported by evidence and in accord with legal standards, the judge confined his inquiry to these two questions; and having answered them in the affirmative, he found "upon that authentic premise" that the plan was fair and equitable as to Housatonic bondholders. In so limiting his review the judge thought he was following the rule laid down in the Western Pacific case, 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892. This interpretation of the majority opinion appears to be the same as Mr. Justice Roberts put upon it, as is shown by his concurring opinion at page 514 of 318 U.S., at page 726 of 63 S.Ct., which expresses his own view that the statute contemplated independent findings by the court as to the equity and fairness "of rights accorded under the plan in relation to those theretofore enjoyed." We do not read the Milwaukee case, 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959, as modifying the rule of the Western Pacific opinion. If, as we hold, the district court correctly performed its function of review, our review on appeal is even more limited in scope. "It is not enough to reverse the District Court that we might have appraised the facts somewhat differently. If there is warrant for the action of the District Court, our task on review is at an end." Milwaukee case, 318 U.S. 523, at page 564, 63 S.Ct. 727, at page 749, 87 L.Ed. 959.

The question remains whether the Commission has satisfied legal standards. Claims of certain other secured creditors of New Haven are being paid off in cash; and the Housatonic bondholders consider this inequality of treatment a violation of priorities, especially in view of the excellent earning record of the Housatonic branch line. We cannot agree. The Supreme Court has said that "so long as creditors receive 'full compensatory treatment' their priorities may be represented by securities of different ranks" (Western Pacific case, 318 U.S. 448, at page 487, 63 S.Ct. 692, at page 714, 87 L.Ed. 892); and

we suppose that it is equally within the discretion of the Commission to give some creditors full compensatory treatment in securities while others receive full compensatory treatment in cash. Nor was the Commission obligated to pay the Housatonic bonds out of the segregated assets of the Housatonic line. "If the creditors are adequately compensated for the loss of their prior claims, it is not material out of what assets they are paid." 318 U.S. 448, 484, 63 S.Ct., 692, 712, 87 L.Ed. 892, quoting from Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, at page 530, 61 S.Ct. 675, at page 687, 85 L.Ed. 982. The appeal of the Housatonic bondholders must fail.[2]

4. The three bank appellants: The President and Directors of the Manhattan Company, Rhode Island Hospital National Bank of Providence, and Merchants National Bank of Boston have appealed both from approval of the plan and from the order classifying them as unsecured creditors. For brevity these appellants will be referred to as the Manhattan bank, the Rhode Island bank and the Merchants bank. When the debtor's petition was filed on October 23, 1935 these banks held notes of New Haven secured by collateral consisting in whole or in part of Old Colony common stock and Boston & Providence common stock. Upon the filing of the petition, an ex parte injunction was issued restraining creditors holding collateral from selling it. While the injunction was in force the stock of both Old Colony and Boston & Providence became valueless because of disaffirmance of the Old Colony and Boston & Providence leases. On the date the injunction was issued the Manhattan bank held New Haven's note for $1,000,000 secured by collateral which upon the basis of current market prices was worth approximately 83% of the debt. On the same date the collateral held by the Rhode Island bank was worth approximately 95% of the debt (about $420,000) owing it; and that held by the Merchants bank, consisting only of Boston & Providence stock, was worth the full amount of the $500,000 note held by it. The Merchants bank applied for a modification of the injunction so as to allow it to sell its collateral; its motion was denied but the order was reversed on appeal. In re New York, New Haven & Hartford Railroad Co., 2 Cir., 102 F.2d 923. Our decision, however, did not better the Merchants

[2] Judge Frank has not participated in the decision as to Housatonic bonds.

48

bank's position for there was no longer a market for the collateral it held. Because their collateral was without substantial value when the plan of reorganization was approved by the Commission, the plan treats these banks as unsecured creditors. They contend that the plan is not fair and equitable as to them; that they are entitled to the status they had when the debtor's petition was filed, that is to say, to be treated as secured creditors—partly secured in the case of Manhattan and Rhode Island and wholly secured in the case of Merchants. The district judge overruled their objections to the plan and made the order classifying them as unsecured creditors.

■ One ground on which this ruling is sought to be supported is the argument that "intrinsically" the collateral never had value because the value of each of the securities here involved depended in the last analysis upon the earnings properly allocable to the underlying property, information as to such allocation of earnings was not available until laboriously computed during the pendency of the bankruptcy proceedings, and, when compiled, showed the stock to be worthless. With this contention we cannot agree. Value depends on what people will pay, although their judgment may be mistaken. See Ithaca Trust Co. v. United States, 279 U.S. 151, 155, 49 S.Ct. 291, 73 L.Ed. 647; W. T. Grant Co. v. Duggan, 2 Cir., 94 F.2d 859, 861; Andrews v. Commissioner, 2 Cir., 135 F.2d 314, 317, certiorari denied 320 U.S. 748, 64 S.Ct. 51.

■ A more cogent argument is based on the Rock Island case, Continental Illinois Nat. Bank & Trust Co. v. Chicago, Rock Island & P. R. Co., 294 U.S. 648, 55 S.Ct. 595, 606, 79 L.Ed. 1110, which held that under § 77 the district court had power under the circumstances there appearing to enjoin a pledgee from realizing on his collateral. At pages 676, 677 of 294, at pages 606, 607 of 55 S.Ct., 79 L.Ed. 1110 the opinion discussed the possibility that during the restraint the collateral might decline in value and stated that this possibility presented a question addressed to the court's discretion not to its power to issue the restraint. The appellees interpret these remarks to mean that in every case the party enjoined must bear the risk of loss from a decline in the market value of his security. But we do not so read the dictum. Mr. Justice Sutherland says that the possibility of decline does not defeat the court's power; he does not

say that the injured pledgee is without a remedy. On the contrary, the opinion states: "The injunction here in no way impairs the lien, or disturbs the preferred rank of the pledgees." In the case at bar it has been allowed to disturb their preferred rank. We do not think this is fair and equitable treatment. The injunction was justified only on the theory that it would benefit the debtor's estate. The damage to the banks resulting from it ought not equitably to be saddled on them but on the parties for whose supposed benefit the restraint was imposed, and particularly is this true where the decline in the value of the collateral resulted from an act of the debtor itself. In our opinion fair and equitable treatment requires that the damage caused the banks should be made good to them and that they should be classified as secured creditors to the extent to which they could have realized on their collateral had they not been restrained from selling, and as unsecured creditors only for the amount by which the debts owing them exceed such realizable value of the collateral. We have been referred to no case where a reorganization court in a section 77 proceeding has been confronted with the precise problem here presented. But we think Koppel Industrial Car & Equipment Co. v. Lee, 1 Cir., 3 F.2d 886, 887, tends to support our conclusion. See also Arkadelphia Milling Co. v. St. Louis S. W. R. Co., 249 U.S. 134, 145, 39 S.Ct. 237, 63 L.Ed. 517; Bindseil v. Liberty Trust Co., 3 Cir., 248 F. 112, 115; Central Manhattan Properties v. D. A. Schulte, Inc., 2 Cir., 91 F.2d 728, 729, certiorari denied 302 U.S. 743, 58 S.Ct. 145, 82 L.Ed. 575. We therefore hold that the plan is inequitable in respect to these bank creditors and that the classification order is erroneous as to them.

The manner in which our views shall be put into effect under the plan we leave for determination by the district judge. Conceivably, fair and equitable treatment for these creditors can be accomplished without the necessity of referring the plan back to the Commission.

5. The Old Colony: The Protective Committee for bonds of Old Colony Railroad Company attacks the legality of the plan of reorganization on the ground that it is not based upon a valid finding by the Commission of the value of the assets of Old Colony which the reorganized New Haven is to acquire. In its first supplemental report, 244 I. C. C. 239, 267, the

Commission proposed a plan for the purchase of Old Colony assets at a price of $16,448,000 face amount of the new securities to be issued by New Haven. In its third supplemental report the price was reduced to $5,756,800 face amount of the new securities, and this price has been carried forward into the Commission's fourth and fifth reports, except as modified in the latter to recognize the actual earnings of Old Colony for the years 1942 and 1943. This price, the appellant argues, was a compromise price recommended in the Joint Report[3] filed with the Commission on April 4, 1942, and was adopted by the Commission without an independent exercise by it of its expert judgment and without stating reasons for the enormous reduction in its earlier valuation of Old Colony assets. Such contention, if substantiated, presents a fatal objection to affirmance of the order approving the plan.

Section 77 requires an independent determination by the Commission that the plan is "fair and equitable". The heart of such a determination is a finding of fact by the Commission as to the value of the debtor's property. It follows that that finding cannot be based upon the consent of some of the interested parties but must be a conclusion independently reached by the Commission upon a consideration of the evidence. One of the purposes of section 77 was to do away with an evil prevalent in reorganization through equity receivership proceedings, namely, the customary practice of submitting to the court a plan already consented to by a large proportion of the old security holders and thus exerting pressure on the court to approve it against objections of minorities, because failure to do so would mean the upsetting of a fait accompli and the undoing of an immense amount of effort and negotiation. See New England Coal & Coke Co. v. Rutland R. Co., 2 Cir., 143 F.2d 179, 188; Fuller, The Background and Techniques of Equity and Bankruptcy Railroad Reorganizations—A survey, 7 Law and Contemporary Problems (1940) 377, 384; S. E. C. Report on Protective and Reorganization Committees, Part VIII, 152. That it was improper for the equity court to yield to such pressure was clearly shown in First Nat. Bank v. Flershem, 290 U.S. 504, at page 525, 54 S.Ct. 298, at page 306, 78 L.Ed.

465, 90 A.L.R. 391 by the statement: "The failure to secure an adequate price seems to have been due, not to lack of opposing evidence, but to the mistaken belief that it was the duty of the court to aid in effectuating the plan of reorganization, since a very large majority of the debenture holders had assented to it." See also National Surety Co. v. Coriell, 289 U.S. 426, 436, 53 S.Ct. 678, 681, 77 L.Ed. 1300, 88 A.L.R. 1231. Section 77 "manifests the intention of Congress to place reorganization under the leadership of the Commission" (Ecker v. Western Pac. R. Corp., 318 U.S. 448, at page 468, 63 S.Ct. 692, at page 705, 87 L.Ed. 892), and we cannot doubt that the Commission must approve the plan in the exercise of an independent judgment uninfluenced by the fact that interested parties have agreed upon its terms. Consequently it would be a serious departure from the statute if the Commission approved a valuation for Old Colony assets because of fears that, should it fix any other, a previous agreement negotiated by a substantial number of interested security holders would be upset, with consequent delay in consummating a reorganization.

The Commission's third supplemental report, 254 I. C. C. 63, with respect to the Old Colony purchase price is substantially a copy of the Joint Report changed only to meet the requirements of a report by the Commission. The Commission said, 254 I. C. C. at page 96: "As seen herein, the principal debtor and its major secured creditors, the Old Colony and the mutual savings bank group, the latter holding more than one-half of the bonds of the Old Colony, and a representative of the public, an assistant attorney general of the Commonwealth of Massachusetts (it was understood that any agreement of the assistant attorney general would not be binding on the Commonwealth), have agreed upon a compromise purchase price. The basis of the compromise has been fully explained. The desirability, in some situations, of a compromise has been stated by the Supreme Court in Case [et al.] v. Los Angeles Lumber Products Co. [Ltd.], 308 U.S. 106 [60 S.Ct. 1, 84 L.Ed. 110]. While the agreed purchase price is smaller in amount than that which we formerly determined, upon further consideration, we find that the purchase price proposed in the joint report is

---

[3] The origins of the report of the "compromise committee" appended to Judge Hincks' opinion of December 8, 1941, and of the "Joint Report" filed with the Commission are set forth in 54 F.Supp. at page 610 et seq. and need not be here repeated.

fair and equitable, and, in our opinion, conforms to the principles which the court in its opinion indicated governed, and we will modify the plan accordingly."

Again, 254 I. C. C. at page 99, the Commission said that "the court * * * indicated that in its opinion the best prospect of prompt progress appeared to be by reasonable compromise." It said also that while the principal New Haven and Old Colony parties "have evolved an agreed basis for inclusion of the Old Colony in the reorganization," certain of Old Colony's security holders and representatives of the Commonwealth of Massachusetts "strongly oppose such agreement." It then added "In our opinion, and we have so found, the agreement in respect of the Old Colony, with minor modifications made therein by us, offers a fair and equitable solution of these problems."

We find it difficult to read the third supplemental report and draw any inference other than that the agreement of the parties was the dominant factor in the Commission's formal finding that the purchase price is fair and equitable. This formal finding might perhaps suffice[4] if the Commission had stated the reasons which lead it to reduce by some $10,000,000 face value of the new securities its prior valuation, but we find no reference to facts causing such change unless it be the compromise approved by the parties. Moreover, in its fourth supplemental report (254 I. C. C. 405, 422) the Commission, after discussing a proposal by the Commonwealth of Massachusetts with respect to Old Colony, makes the following significant statement: "It is likewise clear that to modify materially the provisions of the joint report in respect of the Old Colony would be to nullify the compromise agreement reached after extended negotiations with little or no expectation that the suggested modification would prove acceptable to the interested parties. The result again would be a further delay in the consummation of the reorganization of the principal debtor and the Old Colony."

We cannot read this otherwise than as meaning that the Commission accepted the compromise of the joint report for fear that any material modification of it, which the Commission might have independently approved as fair and equitable, would be unacceptable to the parties and would re-sult in delay in consummation of a reorganization. That is to say, the Commission was influenced by the pressure of the compromise agreement and by the fear that a large block of security holders of New Haven would not consent to a plan materially different. We think the appellant has substantiated its contention that the Commission exercised no independent judgment in fixing the purchase price for Old Colony assets but followed the easy route of accepting the compromise. The appellees argue that the Joint Report was not an agreement binding upon those who signed it. Of course it could not be binding until a plan embodying its provisions was approved by the Commission and the judge. But whether or not it was a binding agreement is immaterial if it caused the Commission to refrain from exercising an independent judgment as to the value of the Old Colony assets. We conclude that the district court's order of approval must be reversed so that the Commission may make its own independent findings of value and of price. It is possible, of course, that the Commission may still adhere to figures which are the same as those of the Joint Report. Such correspondence would not in itself invalidate the Commission's conclusions if it "shall state fully the reasons for its conclusions," as required by section 77, sub. d, and such reasons are not the pressure exerted by the compromise.

The Commission's fifth supplemental order provides that if the judge should determine that the provisions of the plan "in respect of the reorganization of the Old Colony are, because of opposition of other than New Haven parties or interests, such as to delay unreasonably and unnecessarily the reorganization of the principal debtor, he may, in his discretion, set such provisions aside and consider and act upon the plan for the reorganization of the principal debtor and the secondary debtors other than the Old Colony." We do not think the district judge should exercise such discretion merely because we have reversed his order of approval. Before the exercise of such discretion by him, the Commission should make a determination of the value of Old Colony assets and of the purchase price to be paid for them. Whether the district judge shall remand the entire plan to the Commission or only the portion relating to the Old Colony we leave for his determination.

---

[4] But compare Tri-State Broadcasting Co. v. Federal C. Comm., 68 App.D.C. 292, 96 F.2d 564, 566.

6. The Commonwealth of Massachusetts. The objections of this appellant relate in large part to those provisions of the plan which permit the reorganized New Haven to give up passenger service on certain portions of the Old Colony lines if losses therefrom exceed specified figures during a given period of time. Whether the curtailment of service is required in the public interest was a matter for the Commission to decide. The general public interest of keeping an interstate railroad running must override the local public interest of Massachusetts if the Commission thinks the two incompatible. The contention is not persuasive that the Commission lacks the power by means of a plan of reorganization to amend the charters of New Haven and Old Colony or to relieve them of performing passenger service unless the state authorities give consent. Section 77, sub. f, declares that upon confirmation of the plan the reorganized debtor "shall have full power and authority to, and shall put into effect and carry out the plan * * *, the laws of any State or the decision or order of any State authority to the contrary notwithstanding." In Palmer v. Massachusetts, 308 U.S. 79, at page 89, 60 S.Ct. 34, at page 39, 84 L.Ed. 93, the court said, "Perhaps it is no less true that amenability to state laws will serve as incentive to the formulation of reorganization plans which, on approval by the Commission, do supplant state authority. And at page 88 of 308 U.S., at page 38 of 60 S.Ct., 84 L.Ed. 93, it was said that governance over local activities of a carrier was withheld not only from the judge but also from the Interstate Commerce Commission, "except as part of a complete plan of reorganization for an insolvent road." We regard these statements as decisive that a plan approved by the Commission may override state laws which the Commission finds incompatible with the plan it deems fair and equitable and in the public interest.

7. Boston Terminal bonds: The trustee of the Boston Terminal Company's bond issue and two committees of holders of these bonds object to the provisions of the plan which affect them. The Terminal Company is a Massachusetts corporation created by special act, Acts of 1896, c. 516, for the purpose of providing a union terminal for five railroads entering the city of Boston from the south and west. Each of these railroads, New Haven and Old Colony being among them, acquired one-fifth of the corporation's capital stock of $500,000 and was required by the Act to use the terminal and to pay the Terminal Company for such use the amounts requisite for its corporate administration and operation including real estate taxes and interest on its bonds of which there are now outstanding $15,155,000. At the time of filing its petition for reorganization New Haven controlled four-fifths of the stock and was chargeable with 70% of the expenses, the other 30% being allocated to the Boston & Albany railroad. The New Haven trustees made the required payments up to October 30, 1939, when an order was entered in these proceedings directing the New Haven trustees to withhold further payment of the Terminal Company's real estate taxes and of an amount equivalent to 70% of its franchise taxes and bond interest. This order was affirmed in Palmer v. Webster & Atlas Nat. Bank, 312 U.S. 156, 61 S.Ct. 542, 85 L.Ed. 642. On November 3, 1939 certain creditors of the Terminal Company filed in the federal district court for Massachusetts a petition under section 77, which was duly approved, and those proceedings are still pending. No plan of reorganization of the Terminal Company has yet been proposed therein. See Boston Terminal Co. v. Mutual Savings Bank Group Committee, 1 Cir., 127 F.2d 707. The New Haven plan of reorganization purports to relieve New Haven from the statutory obligation to use the facilities of Boston Terminal and reduces, retroactively to October 30, 1939, the compensation to be paid for their use by the New Haven trustees subsequent to that date and for such use as the reorganized New Haven shall make in the future. The provisions were correctly construed by the district judge to constitute an offer of a revised arrangement which the Terminal Company is free to accept or reject after submission of the offer to it. If it accepts, it waives any claim for greater compensation; if it rejects, it may claim as an administrative expense compensation for use of the property by the reorganization trustees during these proceedings and may file a claim for any damages to which it may be entitled by reason of abrogation of the statutory obligations for the future.

The appellants' major objection to the proposed plan is that section 77 does not permit a plan to abrogate the state statute. This presents a problem similar to that discussed in the appeal of Massachusetts. For reasons there stated we believe that the

Commission can adopt a plan which abrogates state laws that it finds inimical to public interest in their impingement upon an interstate railroad in reorganization. The Commission has found that the amount required to be paid by New Haven under the statutory arrangement is an unreasonable burden upon it. The plan enables New Haven to reject what in effect amounts to a burdensome lease. The plan, however, does not compel Boston Terminal to furnish the service at the rental offered; if Boston Terminal does not choose to accept the offer, it can, as a creditor, file proof of claim against New Haven for any damages to which it may be entitled. It is argued that Boston Terminal has no power under its charter to accept the offer. This seems irrelevant to the problem whether the Commission has power to approve a plan making the offer. Moreover, the reorganization trustee of Boston Terminal may be able to obtain authority to accept either from the bankruptcy court in Massachusetts or through an amendment of the Boston Terminal Act. The plan could not, and does not attempt to, amend the charter of the Terminal Company; but it does amend, as it can, the charter of the New Haven. The appellants deny this, claiming that the Boston Terminal Act is an exercise of police power by the Commonwealth which the plan may not override. The appellees argue, and we agree, that it was a piece of enabling legislation to permit the railroads which sponsored it to obtain the facilities of a union station and terminal and as such should be regarded as an amendment of the charters of the using railroads. See Mayor, etc., of Worcester v. Norwich & W. R. Co., 109 Mass. 103. But even if the Boston Terminal Act be considered as an exercise of the police power, we believe that its burdensome regulation may be superseded by the provisions of a duly approved plan of reorganization. See State of Texas v. United States, 292 U.S. 522, 531, 54 S.Ct. 819, 78 L.Ed. 1402; In re Missouri Pac. R. Co., D.C.E.D.Mo., 39 F.Supp. 436, 448, affirmed, Missouri Pac. R. Co. v. Thompson, 8 Cir., 134 F.2d 139, certiorari denied 320 U.S. 806, 64 S.Ct. 187.

█ The appellants argue that the plan is subject to the objection discussed in the Old Colony appeal, namely, that the Commission merely adopted the suggestions of the Joint Report. There is nothing wrong with such an adoption, if the Commission on the basis of independent determination reached the conclusion that the suggestions of the Report provide a fair and equitable plan. We are not persuaded that the Commission did not exercise its independent judgment as to the provisions relating to Boston Terminal interests. With respect to these provisions there is no admission in the Commission's fourth supplemental report that it refused to make modifications for fear that the necessary consent of creditors could not be secured, as was the case in regard to Old Colony. Moreover, the purchase price to be paid to Old Colony was mandatorily binding upon it, while here the Commission has merely fixed the allowable limits of an offer which Boston Terminal may reject. Hence the amount of the offer is a matter of business judgment to be considered from the standpoint of New Haven's interests rather than a statutory requirement that assets of a debtor to be organized in these proceedings be valued by the Commission. See Group of Institutional Investors v. Chicago, M., St. P. & P. R. Co., 318 U.S. at page 550, 63 S.Ct. at page 742, 87 L.Ed. 959.

█ The appellants also claim that they did not receive notice or have an opportunity to present evidence either before the Commission or the court. If the Boston Terminal interests are creditors of the New Haven, as the district court held, they received the same notice by publication as other creditors, and should have appeared and offered their evidence at the February 1942 hearing of the Commission, the published notice of which stated that its purpose was to receive evidence material in the light of the district court's recent opinion disapproving the plan approved by the Commission. That opinion mentioned expressly the need for readjustment of obligations to the Boston Terminal. If the appellants are not to be regarded as creditors, as they contend, then they are merely offerees of a proposal for readjustment which they may accept or reject, and we cannot see that they were entitled to be heard. The terms of such a proposal are determined from the standpoint of the public interest and the interests of New Haven rather than those of the Terminal Company and its creditors. Their complaint on the score of lack of opportunity to be heard cannot be sustained.

█ 8. The City of Boston: This appeal deals with taxes claimed to be due the city of Boston. It is urged that the plan is defective in not clearly providing that

such taxes shall be paid as costs of administration; and that a statement by Judge Hincks that "New Haven taxes thus far have been currently discharged when due" [54 F.Supp. 635] is incorrect and, if not corrected, may later be considered a decision that New Haven need not pay such taxes. It will suffice to say that the quoted statement is not a decision of that question and that any tax liabilities of New Haven incurred before consummation of the plan will have to be paid as costs of administration. Indeed, Judge Hincks has so construed the plan. In so far as the city of Boston contends that the plan illegally relieved Old Colony and Boston & Providence from statutory obligations to use the terminal properties, that issue has already been decided adversely to the appellant in our discussion of the appeal of the Boston Terminal bondholders.

For the foregoing reasons we reverse the orders before us on the appeals of the three secured banks and of the Old Colony bondholders. The other appeals are affirmed, but with leave to the district judge to remand to the Commission all or any portions of the plan, if in his opinion it is desirable to have the Commission consider further any provisions of the plan in addition to those affecting Old Colony.

On Motions for Modification of Opinion and Stay of Mandate

■ 1. The trustees of the properties of the New Haven and the Old Colony suggest "a procedure which will accomplish all the rulings of this Court as indicated in its opinion far more expeditiously than the course of procedure which is evidently contemplated in the opinion." Their first suggestion relates to the three bank appellants whose claims were discussed in paragraph 4 of our opinion. We there held that fair and equitable treatment requires that the damage caused the banks should be made good to them and that they should be classified as secured creditors to the extent to which they could have realized on their collateral had they not been restrained from selling, and as unsecured creditors only for the amount by which the debts owing them exceed such realizable value of the collateral; and we left to the district judge to determine the manner in which our ruling should be put into effect under the plan of reorganization. The trustees ask that we now modify or expand our opinion so as to direct the district court to entertain claims in administration by said banks for damages resulting from the injunction and to allow said claims and provide for their payment in cash, pursuant to Section L of the plan relating to claims for expenses of administration of the New Haven estate. Although the banks have not been heard upon the trustees' ex parte motion, we can not conceive that they can have any valid ground for objecting to it. As the trustees say, such procedure will permit the litigation of the novel questions involved in these claims to go forward without delay in the progress of the plan, and the orders of payment made by the district court will be separately appealable. The trustees' motion with respect to the claims of the three banks is granted. Treating their claims for damages as expenses of administration makes possible affirmance of Order No. 736 classifying creditors. Our opinion of January 2, 1945 is modified in accordance with the foregoing paragraph of this opinion.

■ 2. The trustees also move for a modification of our opinion with respect to the provisions of the plan relating to the Old Colony; they ask that, instead of directing the district court to remand to the Commission the portion of the plan relating to the Old Colony, (1) we invite the Commission, if it so desires, to certify to the district court a supplemental report and order stating (a) whether or not its fifth supplemental report and order embodies its own independent findings of value of Old Colony property and of the price to be paid therefor, (b) if not, what said findings are, and (c) the reasons for its conclusions upon said matters as required by section 77(d), 11 U.S.C.A. § 205(d); (2) we direct the district court to send to this court a certified copy of any supplemental report and order of the Commission on said subject matter for appropriate action by this court; and (3) we stay our mandate for 60 days or until the filing of such supplemental report and order within such 60 day period. It is urged that the Commission may adhere to its former findings and merely amplify its reasons and that this court can then proceed to act upon the record thus expanded and thus avoid the hazard of a second appeal with its resulting delay. This suggestion does not commend itself to us. It is plainly extending an invitation to the Commission to adhere to the same figures and to take no account of the earnings of Old Colony in the years

54

since the last hearing before the Commission was closed or of other facts which it may deem relevant. The Commission may wish to take additional evidence and to modify the plan in the light of new facts. We do not wish to preclude such a course if the Commission thinks it desirable. Moreover we have left to the district judge discretion to remand other portions of the plan if in his opinion this seems desirable. The Trustees' motion with respect to the Old Colony is denied.

3. The Commonwealth of Massachusetts requests us to modify our opinion so as to make clear that the remand of the portion of the plan relating to the Old Colony includes the provisions of sections N(2) and N(3) of the plan. This motion is granted. But this is not to be regarded as an intimation that we think the Commission should necessarily exercise its discretion to modify these provisions.

4. Motions to stay our mandate pending applications to the Supreme Court for writs of certiorari have been made by the Commonwealth of Massachusetts, Webster and Atlas National Bank of Boston, trustee, Mutual Savings Bank Group Committee for Boston Terminal Bonds and Institutional Group for Boston Terminal Company Bonds. The motions are denied.

5. The petition for a rehearing filed by Mutual Savings Bank Group Committee for Boston Terminal Company Bonds is also denied.